FILED

2008 May-22  AM 11:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

AMANDA RENEE RICCIO,       )

     PLAINTIFF,        )

VS.                   )        2:06-cv-4833-JHH

THE BOARD OF TRUSTEES OF    )
THE UNIVERSITY OF ALABAMA,
                         )

     DEFENDANT.

## MEMORANDUM OF DECISION

The court has before it the March 3, 2008 motion (doc. # 14) of defendant
the Board of Trustees of the University of Alabama (the Board) for summary
judgment.  Pursuant to the court's March 19, 2008 order, the motion was deemed
submitted, without oral argument, on April 18, 2008.  For the following reasons,
the motion is due to be granted in part and denied in part.

### I. Procedural History

Plaintiff Amanda Renee Riccio commenced this action on December 6,
2006, by filing a complaint in this court alleging discrimination and retaliation in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
More specifically, plaintiff's complaint contends that defendant discriminated

against her because of her sex and retaliated against her for complaining about that discrimination. (See generally Compl.) Defendant's March 3, 2008 motion for summary judgment asserts that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law as to all plaintiff's claims.

Both parties have filed briefs and submitted evidence in support of their respective positions. Defendant submitted a brief and evidence[1] (doc. # 15) in support of its own motion for summary judgment on March 3, 2008. Pursuant to the court's order, defendant then submitted a supplemental brief and evidence[2] (doc. #17) in support of its motion on March 28, 2008. On April 11, 2008, plaintiff filed a brief and evidence[3] (doc. # 18) in opposition to defendant's motion for summary judgment. On April 18, 2008, defendant filed a brief (doc. # 19) in reply to plaintiff's opposition.

---

[1] The defendant submitted the following evidence: excerpts from deposition of Amanda Renee Riccio and exhibits; excerpts from deposition of Olen Pruitt; excerpts from deposition of William A. (Buddy) Cope; affidavit of Ronald Murphy with attachments; affidavit of William S. Odom, Jr. with attachments; and affidavit of Olen Pruitt.

[2] The defendant submitted the following additional evidence: EEOC decision on plaintiff's charge; job description for General Mechanic Group Leader; and affidavit of Doug Royal.

[3] The plaintiff submitted the following evidence: 7/20/04 e-mail from Riccio to Cop and Pruitt; 5/4/05 letter from Riccio to Odom; Hospital Maintenance Organizational Chart; fine art of Olen Pruitt; 6/14/05 letter from Pruitt to Riccio; deposition of Riccio; deposition of Pruitt; deposition of Cope; plaintiff's response to defendant's first interrogatories; and Hospital Maintenance Area Assignments dated effective 12/04.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. After the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable

3

jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.  <u>See id.</u> at 249.

The method used by the party moving for summary judgment to discharge

its initial burden depends on whether that party bears the burden of proof on the

issue at trial.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-17 (citing <u>United States v. Four</u>

<u>Parcels of Real Prop.</u>, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving

party bears the burden of proof at trial, then it can only meet its initial burden on

summary judgment by coming forward with positive evidence demonstrating the

absence of a genuine issue of material fact; i.e. facts that would entitle it to a

directed verdict if not controverted at trial.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once

the moving party makes such a showing, the burden shifts to the non-moving party

to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy

its initial burden on summary judgment in either of two ways.  First, the moving

party may produce affirmative evidence negating a material fact, thus

demonstrating that the non-moving party will be unable to prove its case at trial.

Once the moving party satisfies its burden using this method, the non-moving

party must respond with positive evidence sufficient to resist a motion for directed

4

verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Plaintiff Amanda Renee Riccio graduated from the University of Alabama at Birmingham (UAB) as a mechanical engineer.  (See Pl. Ex. B.)  She began her employment at UAB in the Center for Biophysical Sciences and Engineering (CBSE) in February 1997 in an Engineer I position.  (Riccio Dep. at 8, 9.)  In this position, Riccio "work[ed] with the space shuttle and payload operations."  (Id. at 9.)  In layman's terms, Riccio wrote procedures for "the crew members . . . on the [space] shuttle of how to operate our equipment."  (Id. at 11.)  She was a liason between NASA and the CBSE.  (Id. at 12.)  In late 2002, Riccio left this position as part of a layoff due to a loss of grant funding.  (Id. at 14.)  At the time she left, her salary was $45,435.00.  (See Pl. Ex. B.)

#### A.  Riccio's Employment as an Engineer Trainee

Toward the end of 2002, Riccio interviewed with William "Buddy" Cope, the Executive Director of Facilities Management at UAB.[5]  (Riccio Dep. at 22;

---

[4]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

[5]  Apparently, Riccio's husband called Cope, explained his wife's situation, and asked if Cope had any openings for an engineer in his department.  (Riccio Dep. at 21-22.)

Cope Dep. at 11.)  Riccio testified that Cope hired her during this interview (Riccio Dep. at 22, 28), but that she also interviewed with Olen Pruitt, the Director of Hospital Maintenance at UAB, before she began work.  (Riccio Dep. at 29-30.) Cope told Riccio that she "would be learning the floor plan of the hospital" and that she "would be kind of getting to know the mechanics and their areas and touching base." (Riccio Dep. at 23.)   Also during her interview with Cope, Riccio was told that her position would be that of an Engineer Trainee, with a starting salary of $35,672.  (Id. at 22-23, 27.)  Riccio raised an issue with Cope about this starting salary, as she would be taking a pay cut, but Cope allegedly assured her that "it would probably take only a few months but maybe up to six month and [Riccio] would be promoted to an engineer one," thus raising her salary.  (Id. at 23; see Pl. Ex. B.)

Prior to beginning work, Riccio learned that another individual, Joseph Grice, had also been hired around the same time she was as an Engineer Trainee. (Id. at 24.)  It is undisputed that Grice began at the same starting salary as Riccio. (Id. at 47; Cope Dep. at 31.)  Grice and Riccio did not work together, as Grice worked on the campus side of UAB while Riccio worked on the hospital side. (Cope Dep. at 28-29.)

Riccio began work on December 9, 2002, and met with Darryl Crider, the

7

Maintenance Manager for the hospital, who supplied Riccio with her schedule that consisted of four weeks of general mechanic training.  (Ex. 8 to Riccio Dep.)  For those weeks, she worked with the maintenance mechanics and received "hands-on" training.  (Id.)  Riccio next worked with the plumbers and electricians for eight weeks, and received similar training in their areas.  (Id.)  Riccio contends that she received "very positive feedback" from all three assignments.  (Id.)

Riccio was then assigned to work with Mark Nichols, a temporary service employee, who was in charge of coordinating the update of the utilities management program documentation.  (Id.)  Riccio noted that Nichols, who was a mechanical engineering student, had a much more desirable office and amenities[6] than she did.  (Id.)  She stated that he treated her as his inferior, but she "tried to overlook it since [she] ha[d] only three month left in [her] training" before gaining her Engineer I title and pay raise.  (Id.)  Riccio also noted in her diary that she found documentation listing Nichols as an Engineer I, even with the completion of his degree requirements.  (Id.)

Riccio attended quarterly meetings with Cope and Pruitt, to discuss her progress, and was generally discouraged by them.  (Id.)  Cope and Pruitt continued

---

[6] The amenities included a private office, telephone, large desk and new computer, while Riccio shared an office and telephone with a co-worker and had a small work area and old computer.  (Ex. 8 to Riccio Dep.)

8

to tell Riccio that she needed more training, and Riccio became convinced that they were not going to move her to the Engineer I position.  (Id.)  During these meetings, Cope and Pruitt would "quiz" Riccio on different aspects of the hospital maintenance.  (Id.)  Riccio could not answer all of the questions posed to her during many of these meetings, and Cope and Pruitt believed that Riccio was "taking longer than the originally scheduled six months for [her] to become knowledgeable of the utility systems."  (Id.)  Pruitt explained to Riccio that she needed additional training, and that it was important that she had a "good understanding of the critical utility systems and their components."  (Id.)  The priority was on "learning the Hospital utility systems from an engineering perspective, rather than how much time is logged with each craft."  (Id.)

Throughout the next months, Riccio continued her training in the different maintenance areas.  (Id.)  She also continued to have her quarterly meetings which always included Cope and Pruitt telling Riccio that she did not know enough about the systems and statements like her training was "too slow."  (Id.)  In February 2004, Riccio began working on the Utilities Management Manual under the supervision of Scott Davis.  (Id.)  Although half of her time was still to be spent on training, Riccio's dairy notes that she never went back to training, but spent all her time with the "Utilities work at North Pavilion." (Id.)

9

In her March 24, 2004 quarterly meeting, after Riccio could not answer a couple of questions posed by Pruitt, Riccio was told that she needed to be doing a lot of studying on her own after work to advance and that her training was going too slowly.  (Id.)  Riccio responded that if she had been told that she was going to be asked questions in a certain area, she would have studied that area, but that they asked her random questions, about random systems, some of which she had never worked on.  (Id.)  She also reminded them that she had been pulled off her training to update the utilities management manual, but Pruitt responded that she should be studying at home.  (Id.)  Riccio pointed out that she had children to take care of after work, which made studying at home difficult.  (Id.)

Then, in April 2004, Riccio learned that she was not invited to the Facilities Retreat.  (Id.)  She was told that engineer trainees, like herself, were not included in retreats.  (Id.)  However, Riccio later learned that Grice, the engineer trainee on the campus side, attended the retreat with the engineers and supervisors.  (Id.)  Riccio believes that she was not included in this and other trips because she is a woman.  (Id.)

On April 8, 2004, Riccio sent a memorandum to Pruitt and Cope asking for their help.  (Id.)  She never heard any response.  (Id.)  Riccio continued to work with Scott Davis, reviewing over 700 files regarding almost 300 failure reports.

10

(Id.)  She also worked with Darryl Crider on creating monthly review sign off sheets for the files.  (Id.)

In September 2004, Riccio was assigned to work with Ronald Murphy, the maintenance supervisor for the Jefferson Tower (JT) Block.  (Id.; Riccio Dep. at 220-21, 232-33.)  Although the purpose of this assignment was to work as Murphy's assistant, Riccio contends that Murphy began to give her supervisory duties.  (Id.; Pruitt Dep. at 23; Murphy Aff. ¶ 4.)  By October she was filling out material request forms, generating failure reports and other duties.  (Ex. 8 to Riccio Dep.)  She also started doing payroll for the JT Block and North Pavilion mechanics.  (Id.)  At this time, her title changed to Engineer Associate, although her duties and compensation did not change.  (Id.)

Then, in November 2004, Riccio "assumed full responsibility for [the] JT Block mechanics."[7]  (Id.; Riccio Dep. at 233; see also Pl. Ex. C.)   Riccio met with Pruitt and Cope on November 29, 2004 for her quarterly trainee meeting, and "made it known to Buddy [Cope] that [she] has assumed full responsibility for the JT Block mechanics."  (Ex. 8 to Riccio Dep.)  Cope asked her when this occurred, and Riccio told him that Murphy handed over the JT Block that month, and Cope

---

[7] The defendant vehemently denies that Riccio effectively became the supervisor of the JT Block.

agreed that it was time.  (Id.)  Pruitt and Cope asked Riccio technical questions like they did in the past, but ended the meeting by telling her that if "things work[] out as a supervisor, then [she] could work toward getting to an Engineer I position."  (Id.)

Also in November 2004, Cope retired and Pruitt became the Interim Executive Director of Facilities.  (Riccio Dep. at 265.)  William "Bill" Odom became the Interim Director of Hospital Maintenance at this time.  (Odom Aff. ¶ 3.)  Riccio's title was still that of Engineer Associate, and she now reported to Odom as of November 2004.  (Id. at ¶ 4.)

Riccio's first quarterly meeting after this change in management occurred in February 2005.  (Id.)  She met with Odom before the meeting, and he tried to give her an idea of what topics would be covered in her meeting, something that had never occurred before.  (Id.)  Her quarterly meeting went well, and she was told what topics she would be expected to cover the next meeting.  (Id.)

Riccio was also told that she would have a new office in the JT Tunnel. (Id.)  She was concerned because the tunnel was isolated, but was told that there are cameras and call stations.  (Id.)  One of the mechanics even asked her what she "did to deserve detention in the tunnel."  (Id.)

On March 30, 2005, Riccio met with Crider to discuss the possibility of

12

Riccio working the weekend rotation with the other supervisors.  (Id.)  Although Riccio told Crider that she was able work weekend shifts, she told him that she had reservations because her pay was too low.  (Id.)  Crider said that was not something that he could control, so Riccio was not scheduled for the weekend shift rotation.  (Id.)

By April 2005, Riccio had been performing the duties of a supervisor for the JT Block for six months.  (Id.)  The UAB Hospital Maintenance Organization Chart, dated March 2005, lists Riccio the individual responsible for the JT Block.[8] (Pl. Ex. C.)  According to Riccio, she had eight (8) mechanics working under her and one (1) dispatcher/scheduler that she supervised.  (Ex. 8 to Riccio Dep.)  At that time, she was making $38,211.00, which was significantly less than the other supervisors.  (Id.)

### B.  May 4, 2005 Memorandum to Bill Odom

On May 4, 2005, Riccio sent a memorandum to her supervisor, Bill Odom, asking for his "help in having [her] compensation evaluated and adjusted to a level commensurate with the fair market value of my current job duties, responsibilities, educational background, and job experience."  (Pl. Ex. B.)  After relaying some of

---

[8] The chart lists Riccio as an Engineer Trainee, with her supervisor being Daryl Crider, the Engineer Manager.

13

her employment history with UAB, Riccio wrote that her "salary progression has not been satisfactory" and complained that she could not "understand why [her] compensation has been, and continues to be, 'out of sync' with [her] high level of job performance." (Id.)

The memorandum continued with Riccio's "research" of the salaries of her "peer supervisors in an effort to understand the rationale of [her] compensation when compared to the compensation rates of the other supervisors." (Id.) Riccio acknowledged that although her job title was that of an "Engineer Associate/Supervisor Trainee," she was "performing job duties at the level of other employees whose titles and pay rates reflect a 'Supervisor' title and pay rate." (Id.) As such, she compared herself to those individuals, regardless of her current job title. (Id.)

She then provided Odom with a chart, comparing her salary to that of eleven supervisors.[9] (Id.) She specifically notes that the "years of service have little bearing upon the pay structure developed for these supervisors" and that she is "the only one in the comparison group with a degree in mechanical engineering." (Id.) Riccio again stated that she is "at a loss as to my current compensation as compared to that of other supervisors" and provided the following chart:

_____

[9] The letter does not state why Riccio chose those eleven supervisors.

14

| Name | Years of Service | Degree or Certificate | FY 2004/2005 Salary |
|---|---|---|---|
| Mr. Fred Prince | 21.0 | yes | $ 57,833.64 |
| Mr. Jerry Hall | 22.50 | n/a | $ 52,004.52 |
| Mr. Ron Murphy | 13.33 | yes | $ 52,004.52 |
| Mr. Danny Wilson | 31.25 | n/a | $ 52,004.52 |
| Mr. Fred Chambers | 25.50 | n/a | $ 52,004.52 |
| Mr. Thomas Harris | 33.25 | yes | $ 52,004.52 |
| Mr. Rick Gunter | 31.66 | yes | $ 52,004.52 |
| Mr. Grady Shouse | 33.08 | n/a | $ 53,587.92 |
| Mr. Franklin Littlejohn | 20.66 | yes | $ 52,004.52 |
| Mr. Thomas Caldwell | 34.08 | n/a | $ 52,004.52 |
| Mr. Bob Miller | 29.16 | n/a | $ 52,004.52 |

(Id.)

Riccio's memorandum continued by explaining that she "took this position in order to broaden [her] engineering skill-set within a different engineering environment." (Id.) She commented that her decision "as it relates to . . . job experience and exposures has not been a disappointment" because of the amount of knowledge gained and the ability to share her "technological skills to solve problem." (Id.) Riccio characterized the job as a "win-win" situation for both herself and the hospital. (Id.) She ended her letter with the following paragraph:

Mr. Odom, please know that before I drafted one word on this

15

memorandum I took "a good long look in the mirror" and analyzed my strengths, weaknesses and contributions to your department. The result of my introspection . . . I am not being adequately compensated for my level of duties, responsibilities, education, experience, and "get it done" attitude. In closing, I need for you to intervene and be my advocate and correct my current compensation. I would appreciate your review and insight related to the subject contained in this memorandum, and I welcome the opportunity for you and me to meet and discuss a solution.

(Id.)

## C. Aftermath of May 4 Memorandum

At some point after Odom received the memorandum from Riccio, he shared the memorandum with Pruitt. (Pruitt Dep. at 19, 21.) The record is silent as to what was discussed between Odom and Pruitt regarding the memorandum. Riccio's diary, however, notes that, although the memorandum was not discussed, in her May 13, 2005 quarterly meeting, Riccio believed that Pruitt knew about the memorandum because of a change in the "tone" of the meeting as compared to the previous quarterly meeting. (Ex. 8 to Riccio Dep.) According to Riccio's diary, Pruitt asked her "to go over technical training," and denied telling Riccio to concentrate on supervisory work and to disregard her technical/engineering training for a while. (Id.) Pruitt then told Riccio that they would revisit the technical/engineering side at the next meeting and instructed her to purchase a HVAC technical/vocational book for training. (Id.)

16

### D.  May 16, 2005 Meeting with Connie Pruett

When Riccio had not received a reply from Odom regarding her

memorandum, Riccio sent an e-mail to human resource representative Connie

Pruett[10] regarding her concerns.  (Id.; Riccio Dep. at 271-72.)  Riccio met with

Connie Pruett on May 16, 2005, and gave her a copy of the memorandum she had

given to Odom, along with copies of some earlier letters, to give Connie Pruett

some context about her job history.  (Ex. 8 to Riccio Dep.)   In her diary, Riccio

relayed that she explained to Connie Pruett that she believed that Odom and Pruitt

were "working [her] cheap and not paying [her] the same as the other supervisors

due to being a woman."  (Id.)

After this meeting, Connie Pruett met with Odom regarding Riccio's

complaint and showed Odom the documentation Riccio gave Connie Pruett during

their meeting.  (Id.)   In an e-mail sent to Riccio from Connie Pruett,[11] Connie

Pruett stated that because of Odom's relatively new status as Interim Director of

Hospital Maintenance, Odom was unaware of some of Riccio's "history."  (Id.)  In

addition, Connie Pruett relayed that Odom was "very supportive of exploring

_____

[10] There is no relationship between Connie Pruett and Olen Pruitt.  For clarity's sake, the
court refers to Connie Pruett by her full name throughout this memorandum of decision.

[11] Other than the quick notes in this e-mail, the record is silent as to what was discussed
between Pruett and Odom in this meeting.

17

[Riccio's] current situation to see if there are any changes that can be made." (<u>Id.</u>) She stated that she and Odom wanted to talk to Pruitt before the four of them had a meeting to discuss the situation. (<u>Id.</u>) That meeting was held on June 3, 2005. (<u>See</u> <u>id.</u>) The record is silent as to what was discussed in that meeting.[12]

### E.   June 16, 2005 Meeting

Riccio met with Pruitt, Odom, and Connie Pruett on June 16, 2005, in response to Riccio's memorandum. (<u>Id.</u>; Pruitt Dep. at 22; Riccio Dep. at 273.) Pruitt prepared a response to Riccio's memorandum before the meeting, which was discussed at length. (Pruitt Dep. at 21-22; Riccio Dep. at 273-74.) The meeting lasted over two hours and the thrust of the discussion surrounded Riccio's job performance, although Riccio thought that the meeting would be about her pay. (Riccio Dep. at 273-74; Ex. 8 to Riccio Dep.) Riccio's diary describes the meeting in detail:

> I was told by Olen [Pruitt] (for about 2 hours) that I was a trainee and that I was not progressing. He told me that I was not qualified (as did Connie) for the Supervisor position. I was told that the JT Block was never given to me. I disagreed with Olen over the issues of my performance, etc. I told him that I was the JT Supervisor and that I

---

[12] Pruitt testified that he discussed the memorandum with Connie Pruett at some point before the four met. (Pruitt Dep. at 21.) It is unclear from the record whether this discussion was separate from the meeting with Odom and Commie Pruett. Both Odom and Pruitt deny that they were ever told that Riccio's complaint was one of sex discrimination. (Odom Aff. ¶¶ 20-22; Pruitt Dep. at 24.)

had 8 mechanics and 1 Scheduler/Dispatcher.  I told him that I did
everything the other supervisors did and he came back and said that I
didn't work weekend supervisor duty.  I, then, told him that Darryl
asked me to volunteer for it.  I told him that I could not volunteer
until my compensation issues had been resolved. . . .  I also told them
that I did work one weekend.  I told them that I was working on a
daily basis for all maintenance issues involved for the JT Black
(which consists of 7 buildings . . . ).  This includes monthly reports,
weekly payroll, daily pages that were sent to me from Dispatch on
calls in my areas.  It also includes all of the renovation projects that
have been going on since last year.

(Ex. 8 to Riccio Dep.)  Pruitt then gave Riccio a list of the building service review

and told her that she was "go[ing] back to engineer training" and "removed

[Riccio] from all of [her] supervisory duties.  (Id.)  Pruitt was "surprised" by

Riccio's lack of understanding regarding her compensation because of the number

of meetings held discussing the lack of progress Riccio had made in as a trainee.

(Ex. 6 to Pruitt Dep.)  Pruitt discussed her 3 percent raise the previous year due to

Riccio's lack of progression and listed fourteen separate occasions "when [she]

was informed of [her] unsatisfactory progress as a Maintenance Engineer

Trainee."  (Id.)   Pruitt also told Riccio that "he could not sleep at night knowing

that [she] was supervising in the hospital" because she "was not qualified to be a

supervisor."  (Ex. 8 to Riccio Dep.)

F.  Aftermath of the June 16 Meeting

After the June 16 meeting, Riccio discussed her dissatisfaction with the

19

meeting and the fact that the issue of compensation was not addressed, but instead that the meeting focused on her performance, with her husband. (Id.)  The next day, Riccio's husband went to Connie Pruett's supervisor, Cheryl Locke, about the situation. (Id.)  That afternoon Connie Pruett called Riccio and "asked her a lot of questions." (Id.)  Riccio stressed to Connie Pruett that she "was indeed qualified for the supervisor position" and "read [the qualifications] to her and she didn't make any comment." (Id.)  Riccio told Connie Pruett that "Olen had made some statements that were not true and that he removed [her] from the supervisory role in a retaliatory manner." (Id.)  Connie Pruett asked Riccio about the weekend Riccio worked supervisor duty, and Riccio explained that situation. (Id.)

The following week Riccio was on jury duty and away from her job. (See id.)  When she returned, Riccio had a difficult time facing her co-workers. (Id.)  Some of her co-workers asked if she had been terminated while others, although they knew she had been taken off supervisory duties, were "under the impression that [she] requested the change." (Id.)  In addition, the change had "an impact on the department" as some of the mechanics formerly under Riccio's supervision were relocated and forced to learn different areas. (Id.)  Darryl Crider, the Engineer Manager, was given most of those mechanics, which Riccio believed that Crider was "not happy about it and resents the fact that I have caused this to

20

happen to him and others." (Id.)

Riccio, however, "attempted to start [her] HVAC training" and met with the HVAC group leader to begin. (Id.) The group leader told her that the resource material she had was excellent. (Id.) She ran into some scheduling conflicts while trying to get her training in this area. (Id.) Riccio wrote in her diary that the downtime from training was "ok since [she] [was] trying to catch up on all of [her] files/paperwork being transferred to the other supervisors." (Id.)

### G. Events Occurring After the Filing of her EEOC Charge and Complaint

Riccio filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on November 10, 2005, alleging discrimination on the basis of sex and retaliation. (See Compl.) The EEOC mailed her right to sue notice on September 7, 2006, which apparently was not received until October 3, 2006. (See Ex. to Compl.)

After filing her charge of discrimination, in or about October 2006, Riccio applied for a position as a Construction Engineer II. (See Pl. Ex. I.) Sometime after October 23, 2006, Riccio met with Roland Harris to discuss her application. (Id.) Riccio contends that "this was the first time that [she] was required to be re-approved for my qualifications." (Id.) Although Riccio contends that she met the

21

requirements stated on the website, she did not receive the promotion because

"[t]he hiring parties at UAB Facilities . . . made it clear . . .that they did not want a

female in this position and in fact hired or placed a male in this position."  (<u>Id.</u>)

"At or about the same time, [Riccio] applied for an Engineer I position with

Energy Management."  (<u>Id.</u>)  Riccio contends that there was a "whirlwind flurry of

activity" where she was interviewed and offered the Engineer I position in about a

one-month period of time, which was, according to Riccio, "phenomenally fast by

UAB standards."[13]  (<u>Id.</u>)  Her salary was again set at the low end, about which she

was "devastated."  (<u>Id.</u>)  She contacted the Energy Manager, Joe Payne, about a

possible increase in her salary, but he told her that Olen Pruitt and Roland Harris

set the salary and it was non-negotiable.  (<u>Id.</u>)

During her first week in her new position, Riccio contends that she had a

run-in with Payne regarding her working hours.  (<u>Id.</u>)  Although Payne told Riccio

that her work hours would remain the same in her new position, her "work hours

quickly became an issue."  (<u>Id.</u>)  Riccio admitted, however, that she reached an

agreement with Payne regarding her hours and that she basically works the same

---

[13] The record is not clear the exact date when she began or was offered this position -
whether it was before or after she filed her complaint in this court.  Plaintiff contends it occurred
three days before her lawsuit was filed (see Pl. Opp. Br. at 12), but the court has been unable to
find any evidence to support that statement.  Because of the rulings below, the exact date is not
material.

hours as other employees in her area.  (Riccio Dep. at 294-96.)

Riccio believes that "the individuals listed in my complaint continued their unlawful activities through Mr. Payne acting as their subordinate."  (Pl. Ex. I.) Riccio contends that "this patten continued with an oral exam [she] was given to test [her] on some materials that Mr. Payne" gave her to study.  (Id.)  According to Riccio, none of her co-workers were given such exams.  (Id.)  In addition, Riccio contends that the time it took for her to be reimbursed for a job-related travel expense in April 2007 was extraordinary, although she was eventually reimbursed. (Id.; Riccio Dep. at 300-01, 357.)

## IV.  Analysis

Plaintiff's complaint contains two separate claims.  First, plaintiff contends that she was discriminated against because of her sex.  Second, she contends that she was retaliated against for complaining about this alleged discrimination. Defendant first argues that many of the alleged discriminatory and/or retaliatory acts are barred as untimely.  As to those that are timely, defendant contends that plaintiff cannot establish a prima facie case for either claim.  In the alternative, defendant contends that plaintiff has failed to offer evidence sufficient for a reasonable jury to conclude that the defendant's supposedly legitimate reason is merely a pretext for illegal discrimination or retaliation.  The court addresses each

claim separately.

### A.  Discrimination Claims

Title VII prohibits employers from discriminating against employees because of their sex.  See 42 U.S.C. § 2000e-2(a)(1)-(2).  To succeed on a Title VII sex claim, a plaintiff bears the burden of producing a prima facie case of discrimination.  Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997).  A plaintiff may discharge this burden by offering "direct evidence, circumstantial evidence or statistical evidence."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  Here, plaintiff has presented only circumstantial evidence of discrimination.[14]

Circumstantial evidence claims of discrimination are evaluated using "the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."  Combs v. Plantation Patterns, 106 F.3d 1517, 1527 (11th Cir. 1997).  Under the McDonnell Douglas and Burdine

---

[14] Plaintiff effectively concedes this point as her Response in Opposition to Defendant's Motion for Summary Judgment (doc. # 18) analyzes the case only from the standpoint of the *McDonnell Douglas* burden-shifting analysis used for circumstantial cases.

24

framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  After the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[15]  See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[16]  Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d

---

[15] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[16] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

25

at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000);  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000).

### 1.  Untimely Discrimination Claims

As an administrative prerequisite to filing suit under Title VII, an employee must file a timely charge of discrimination with the EEOC.  See, e.g., Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982).  To be timely within a non-deferral state, such as Alabama, the charge must be filed within 180 days of

the last discriminatory act.[17]  42 U.S.C. § 2000e-5(e)(1); Ledbetter v. Goodyear Tire & Rubber Co., Inc., 421 F.3d 1169, 1178 (11th Cir.2005) (explaining that Alabama is a non-deferral state).  The Supreme Court has advised that discrete retaliatory or discriminatory act "occurred" on the day that it "happened." Morgan, 536 U.S. at 110.  Moreover, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Id. at 114.

Riccio filed her charge with the EEOC on November 10, 2005, alleging sex discrimination and retaliation.  (See Ex. A to Compl.)  Although plaintiff argues that "the discrimination . . . began in 2003 or 2004 and continued beyond the point in time when she filed her EEOC charge in November 2005," (Pl. Opp. Br. at 8-9), Title VII bars all discrete acts of discrimination which occurred 180 days prior to November 10, 2005, or before May 13, 2005.  See Stuart v. Jefferson County Dep't of Human Resources, 152 Fed. Appx. 798, 800-01 (11th Cir. 2005) ("We reject [plaintiff's] contention that his claims are continuing violations.  An employer's failure to promote is a discrete act or single occurrence and therefore

[17] Because the 180 day filing requirement is not a jurisdictional requirement, it may be subject to equitable tolling in certain circumstances. Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023, 1025 (11th Cir.1994).  Equitable tolling, however, is not at issue in this case.

27

the continuing violation doctrine does not apply").  Any discrete act occurring before May 13, 2005 is time-barred.  As such, the following claims[18] are time-barred:

- Denial of promotion in May 2004 to Construction Engineer I;
- Not being invited to the spring 2004 Facilities and Maintenance retreat;
- The October 2004 pay raise of 3% as compared to the other engineer trainee's pay raise of 10%;
- Disparities in pay and office amenities as compared to maintenance supervisors in the fall of 2004;
- Not being invited to the Facilities Christmas party in December 2004; and
- Office assignment in February 2005.

(See Compl. ¶¶ 11-12, 14, 18-23.)  Therefore, the motion for summary judgment by the Board as it relates to the above claims is due to be granted.

## 2. Timely Discrimination Claims

Riccio's timely discrimination claims are two: (1) that she was discriminated against because of her sex when her supervisory duties were removed; and (2) that she was discriminated against because of her sex in her pay. The court addresses each discrimination claim in turn, as the evidence that must be established for each differ.

---

[18] The court is unsure whether plaintiff's complaint fully embraces the following alleged adverse actions as actual claims of discrimination.  Out of an abundance of caution, however, the court lists all possible claims contained in the complaint.

28

a.  Supervisory Duties

In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[19]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Bd. of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).

It is undisputed that Riccio is a member of a protected class, female, and that she was qualified for the position she held in the maintenance department. The Board contends, however, that Riccio cannot establish the remaining two elements of her prima facie case of discrimination.  Riccio bears the burden of

---

[19] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

producing evidence sufficient for a reasonable jury to conclude that she suffered

an adverse employment action and that a similarly situated employee of another

class was treated more favorably. Holifield, 115 F.3d at 1562.

Not all conduct by an employer negatively affecting an employee constitutes

adverse employment action. Davis v. Town of Lake Park, Fla., 245 F.3d 1232,

1238 (11th Cir. 2001). To show an adverse employment action, an employee must

demonstrate "a serious and material change in the terms, conditions, or privileges

of employment."[20] Id. at 1239. "[T]he employee's subjective view [of this] is not

controlling." Id. Rather, the employment action at issue "must be materially

adverse as viewed by a reasonable person" under the same circumstances. Id.; see

---

[20] The court wants to make clear that the standard articulated by the Supreme Court in Burlington Northern & Santa Fe R.R. Co. v. White, 126 S. Ct. 2405 (2006) for adverse employment actions in retaliation claims does not equally apply to adverse employment actions in disparate treatment claims. Unpublished decisions in the Eleventh Circuit analyzing disparate treatment actions after Burlington have failed to apply the Burlington adversity standard to disparate treatment claims. See Sampath v. Immucor, Inc., __ Fed. Appx. __, 2008 WL Wallace v. Georgia Dep't of Transp., 212 Fed. Appx. 799, 801,844905, No. 05-15538 at **6 (11th Cir. March 31, 2008); 2006 WL 3626967, No. 06-13345 at **2 (11th Cir. Dec. 13, 2006) ("Under the standard of review articulated in Davis, [plaintiff] cannot establish that his written reprimand constitutes an adverse employment action needed for a prima facie disparate treatment case."); Njie v. Regions Bank, 198 Fed. Appx. 878, 882-83, 2006 WL 2711953, No. 05-13061 at **3 (11th Cir. Sept. 22, 2006) (applying the Davis analysis of adversity to plaintiff's disparate treatment claim); Davis v. U.S. Postmaster Gen., 190 Fed. Appx. 874, 876, 2006 WL 2087569, No. 05-14911 at **2 n.2 (11th Cir. July 26, 2006) ("In reaching this conclusion on [plaintiff's] disparate treatment claim, we need not discuss the Supreme Court's recent decision about the nature of an adverse employment act in a different context: the context of a retaliation claim.") And while unpublished decisions are not considered binding precedent, they are persuasive authority and valuable indicators as to what the Eleventh Circuit would decide in a published opinion. See Eleventh Circuit Rule 36-2.

<u>also</u> <u>Doe v. Dekalb County School Dist.</u>, 145 F.3d 1441, 1453 (11th Cir.1998)

("Any adversity must be material; it is not enough that a transfer imposes some <u>de</u>

<u>minimis</u> inconvenience or alteration of responsibilities.") (addressing an ADA

claim).

The court agrees with Riccio that she suffered an adverse employment

action when her supervisory duties were removed in June 2005.  The Board's

argument to the contrary is unpersuasive.  That her job title never changed, nor

that she did not lose any pay or benefits, does not negate the undisputed fact that

supervisory duties were taken away from Riccio.  Riccio testified that she had

been performing these duties, including supervising eight mechanics and one

dispatcher, since November 2004.[21]  In a real sense, according to the testimony of

Riccio, she was demoted when these duties were removed.  Such action constitutes

a material and serious change in the terms and conditions of Riccio's employment,

and is an adverse employment action in the context of discrimination.  <u>See</u> <u>Davis</u>,

245 F.3d at 1239.

That being said, however, Riccio has not come forward with a suitable

comparator.  <u>See</u> <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999).

---

[21] Defendant vigorously denies that Riccio had these supervisory duties.  However, at this stage in the litigation, the court must accept the evidence in the light most favorable to the plaintiff.

31

Remarkably, she has not even attempted to identify a person outside her protected class who was treated more favorably than she in the context of the removal of her duties after she complained about disparity in pay.   Riccio instead compares herself to Grice and states her allegations as to why Grice was paid more than she. This comparison goes to her discriminatory pay claim, not her claim that she was discriminated against because of her gender when her supervisory duties were removed.  This lack of argument is understandable, however, as the stripping of her duties is a gravamen of Riccio's <u>retaliation claim</u> and is better understood as such: her supervisory duties were removed <u>after</u> she complained about her lower pay.  Riccio's testimony, as well as her diary, are clear as to this point.  There is no evidence that Riccio believed that her duties were removed simply because she was a woman; instead, she testified that she believed they were removed because she complained about the disparities in her pay. Because Riccio failed to establish a similarly-situated comparator, she did not establish a prima facie case of discrimination when it comes to the removal of her supervisory duties.  <u>See Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999); <u>see also Jones v. Bessemer Carraway Med. Cntr.</u>, 137 F.3d 1306, 1311 (11th Cir. 1998), <u>superceded in non-relevant part on denial of reh'g</u>, 151 F.3d 1321 (11th Cir. 1998).  Summary judgment is due to be granted in favor of the Board as to this discrimination

32

claim.[22]

### b.  Disparate Pay

Riccio's second discrimination claim, her disparate pay claim, fairs better than her first.  Title VII makes it an "unlawful employment practice" to discriminate "against any individual with respect to his compensation . . . because of such individual's ... sex," 42 U.S.C. § 2000e-2(a)(1).   "In this circuit, individual disparate-pay claims brought under Title VII are governed by" the McDonnell-Douglas burden-shifting framework.  Ledbetter v. Goodyear Tire & Rubber Co., 421 F.3d 1169, 1185 (11th Cir. 2005).  Under the McDonnell-Douglas approach, "a female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males."  Id.  This, Riccio has done.  Grice occupied the same job as Riccio, and defendant does not dispute that he is a proper comparator.  It is also undisputed that Grice was paid more than Riccio.[23]  As such, Riccio established a

---

[22] There is "no other evidence of discrimination" when it comes to this claim.  See Holifield, 115 F.3d at 1562 ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.").  Instead, as explained above, this claim is really one of retaliation.  Although she "goes through the motions" of stating that the removal of her duties was discrimination in her brief, in light of the record, the claim is more appropriately argued as a retaliation claim.

[23] That Riccio and Grice started at the same rate of pay is of no moment.  It is undisputed that Grice was paid more than Riccio while they were doing the same job.

prima facie case of discrimination in pay.  See id.

The burden now shifts to the Board to produce a nondiscriminatory reason for this difference in pay.  See id.; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1117 (11th Cir. 1993).  The Board states that the reason for Riccio's lower pay was that her performance was inferior to Grice's performance.  The Board contends that "Grice was performing at a higher level than the plaintiff."  This reason satisfies the Board's burden of production.

It is now Riccio's turn to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.  As stated above, Riccio can satisfy this burden in one of two ways: by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Wilson v. B/E Aerospace, Inc. 376 F.3d 1079, 1088 (11th Cir. 2004).  As evidence of pretext, Riccio raises the following arguments:

• The evidence is not clear that Grice was progressing better than Riccio.  In fact, Cope testified that "it was difficult to measure the progress of trainees and described both Ms. Riccio and Mr. Grice as 'pioneers.'" (Cope Dep. at 38.)  In addition, there is little evidence in the record regarding Grice's alleged superior performance, other than

34

the building systems review charts. There is no testimony from Cope regarding Grice's progression,[24] nor is there any from Olen Pruitt. Odom's affidavit states that Grice "made much better progress in learning the engineering systems" and "had demonstrated an understanding of nearly all of the HVAC and electrical systems" by June 2005, but Riccio "had not yet demonstrated an understanding of any of them." (Odom Aff. ¶ 14.)

- The differential between Riccio and Grice can be attributed "to the facilitation of Mr. Grice's advancement and the hampering of Ms. Riccio's by their supervisors." (Pl. Opp. Br. at 13.) As evidence of such facilitation, plaintiff points to the "drudge work and faulty guidance that prevented her from advancing at as rapid a pace, the "indifference" of her supervisors regarding advancement, the tendency to blame Riccio for her failure to advance, and the fact that Riccio was "misled not only in how fast she would advance, but on what it took to advance." (Id. at 12-13.) Additionally, plaintiff highlights the retreats and other functions Grice attended (which were not offered to plaintiff) that helped him move up the ladder more quickly. (Id. at 12.)

- In November 2004, Riccio began supervising the JT Block, including supervising eight (8) mechanics and one (1) scheduler/dispatcher. The UAB Hospital Maintenance Organizational Chart, dated March 2005, shows Riccio as the individual in charge of the JT Block.[25]

- Finally, Riccio was promoted to an Engineer I position in or about early December 2005. This promotion occurred three years after Riccio began as an Engineer Trainee and six months after Odom contends that Riccio was still woefully under-qualified for such a

---

[24] Cope testified that he "couldn't say whether they [Riccio and Grice] were progressing at the same rate or not. That would be up to probably Olen [Pruitt] and Bill Odom and some people they worked for to answer that question." (Cope Dep. at 45.)

[25] The court is aware that the defendant denies this contention, and has testimony to contradict it. That testimony does nothing to help the defendant at this stage in the litigation, as the court must draw all reasonable inference in the plaintiff's favor.

promotion.

Taking this evidence as a whole, Riccio has produced sufficient evidence for a reasonable jury to disbelieve the reason proffered by the Board for the disparity in pay.  First, Riccio presented evidence that she did not under-perform, as proffered by defendant, because she was given additional, supervisory duties during the same time when defendant contends that she was lagging in her performance.  In addition, Riccio was promoted to an Engineer I with Energy Management six months after Odom contends that Riccio was unprepared for such a promotion.  It is hard to believe that Riccio could become prepared in six months when she had been allegedly unable to do so in two and a half years.  Finally, whatever under-performance was noted by her supervisors as compared to Grice, Riccio attributes to the facilitation of Grice's advancement.  This facilitation includes attendance at retreats and other functions where their supervisors were present, but Riccio was not invited.  Because "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," Reeves, 530 U.S. at 147, Riccio established that the Board's explanation for her disparity in pay was a pretext for sex discrimination.  As such, summary judgment is due to be denied as to this claim.

36

*B.  Retaliation Claim*

Title VII also prohibits an employer from retaliating against an employee for enforcing her rights under the Act: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Retaliation is a separate claim under Title VII, and to recover under such a claim, a plaintiff "'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith that the discrimination existed."  Gupta, 212 F.3d at 586 (11th Cir. 2000) (citing Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994)).  Thus even where a plaintiff has failed to make a prima facie showing of discrimination (or present sufficient evidence of discriminatory treatment), she may still have a valid claim for retaliation.

To establish a prima facie case of retaliation, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment

37

decision.  See Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1336 (11th Cir.

1999).  A causal connection is established when the plaintiff shows that the

decision-maker was aware of the protected conduct and that the protected activity

and the adverse action were not wholly unrelated.  See id. at 1377.  Thus, a "close

temporal proximity" between the plaintiff's protected conduct and an adverse

employment action generally is sufficient circumstantial evidence of a causal

connection for purposes of a prima facie case.  See id.  On the other hand, a

substantial delay between the protected activity and the adverse employment

action and the absence of other evidence tending to show causation may justify

judgment as a matter of law for the employer.  See Wascura v. City of South

Miami, 257 F.3d 1238, 1248 (11th Cir. 2001); see also Maniccia v. Brown, 171

F.3d 1364, 1370 (11th Cir. 1999).

Just as with her discrimination claim, once the plaintiff has made a prima

facie case of retaliation, the defendant must come forward with a legitimate, non-

retaliatory reason for the adverse employment decision.  See St. Mary's Honor

Cntr v. Hicks, 509 U.S. 502, 507 (1993).  Because a plaintiff bears the burden of

proving pretext, after defendant has articulated a legitimate, nonretaliatory reason

for the termination, plaintiff must present significantly probative evidence proving

pretext to avoid summary judgment.  See Celotex, 477 U.S. at 317.  That is, the

plaintiff must establish evidence from which a reasonable trier of fact would disbelieve rather than disagree with defendant's articulated legitimate, nonretaliatory reason for the adverse employment action.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997).

### 1. Timeliness

A "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Gregory v. Georgia Dep't of Human Res., 355 F.3d 1277, 1280 (11th Cir. 2004).  Judicial claims that "amplify, clarify, or more clearly focus" the allegations in the EEOC charge are permitted, but the plaintiff cannot allege new acts of discrimination.  Id. at 1279-80.  However, when a retaliation claim is based on adverse actions taken against the employee after the initial EEOC charge is filed, the Eleventh Circuit holds that the retaliation claim grows out of a properly filed employment discrimination charge, and it is not necessary for a plaintiff to file a second charge specifically alleging retaliation. See Gupta, 654 F.2d at 414 (plaintiff alleged retaliation after filing of EEOC charge); Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1988) (plaintiff alleged retaliation after filing of judicial complaint).

Riccio contends she was retaliated against after she filed her EEOC

complaint.  She complains of a denial of promotion to Engineer II which occurred

before after she filed her EEOC charge, but before she filed her judicial complaint.

She also complains about her salary, working hours, and reimbursement problems

in her Engineer I position, which all occurred after she filed her EEOC charge and

judicial complaint.  Although Riccio never filed an amended EEOC charge to

include these alleged acts of retaliation, the Eleventh Circuit does not require one.

See Gupta, 654 F.2d at 414.  The failure to file a new EEOC charge or to amend

her old EEOC charge to include these new allegations of retaliation does not bar

the claims in this court.  Id.

That being said, however, none of these allegations are contained in the

complaint before this court.  The denial of the promotion to the Engineer II

position occurred in or around October of 2006, before the complaint was filed.

Although the allegations surrounding the Engineer I position occurred after the

complaint was filed, Riccio never amended her complaint, or even attempted to

amend her complaint, to add these allegations.  Instead, her allegations encompass

the events outside the 180 day window, the disparity in her pay, and those events

surrounding the removal of her supervisory duties only.  As such, any alleged

retaliation in the denial of the Engineer II position and the issues in the Engineer I

position she currently holds are not properly before the court as they are not

contained in the complaint.  The mere inclusion of them in her interrogatory responses does not suffice.

## 2.  Prima Facie Case

The defendant contends that plaintiff is unable to establish any of the three elements of her prima facie case.  The court discusses each element in turn and concludes that although Riccio established the first two element of her prima facie case, she did not establish the last element, causation.

### a.  Statutorily Protected Activity

Title VII's retaliation provisions protect only certain kinds of activity. Under the opposition clause,[26] an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3 (a).  To recover for retaliation, the plaintiff does not need to show that she made a "formal" protest; informal complaints to superiors about unlawful discrimination are clearly within the scope of statutorily protected conduct.  Rollins v. State of Fla. Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989).  A plaintiff, however, must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  Weeks v. Harden Mfg. Corp., 291 F.3d 1307,

---

[26] The participation clause is not relevant to the instant claim of retaliation.

1311 (11th Cir. 2002).

Riccio contends that she engaged in protected activity under the opposition clause when she complained to her supervisor about the disparity in pay between the maintenance supervisors and herself.  She argues that "[i]t is no coincidence" that she "included the title 'Mr.' before every employee listed in her memorandum." (Pl. Opp. Br. at 16.)  Riccio contends that she "sought to take the less inflammatory road and did not accuse her employer of outright discrimination. Instead she pointed out the discrepancies, provided data that made clear that being a male meant making more money, and asked that the situation be remedied."  (Id. at 16-17.)  She ends that she "was not required to say any magic words to make sure that her complaint of discrimination was lodged." (Id. at 17.)

While it is certainly true that there are no "magic words" that must be said to lodge a complaint of discrimination, the words said must, at a minimum, put the employer on notice that the complaint is one of discrimination, and not simply pay disparity.  The May 4, 2005 memorandum does not suffice.  Nowhere does Riccio allege that she is being paid less because she is a woman.  Instead, the thrust of her complaint in that memorandum is that she is performing the duties of the other supervisors and should be paid the same as they are.  She makes no connection in this memorandum to the fact that the supervisors are male, while she is female,

42

and that is why she believes that she is paid less.

The court has not found any authority, and plaintiff certainly did not point the court to any, where the Eleventh Circuit has required an employer to draw inferences from a complaint that is clearly about pay to include a complaint about sex discrimination as well. The court refuses to do so here, and concludes that the May 4, 2005 memorandum does not constitute protected activity. That being said, however, it is undisputed that Riccio specifically told Connie Pruett that she believed that she was being paid less because she was a female. There are no inferences that must be drawn from this statement. This complaint to Connie Pruett constitutes protected activity under Title VII.

### b. Adverse Employment Action[27]

The Supreme Court has recently provided some guidance on the level of materiality required for a plaintiff to establish the second element of the retaliation prima facie case. In Burlington Northern & Santa Fe R.R. Co. v. White, the Supreme Court concluded that "the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable

---

[27] As the court explains in footnote 20, the standard for an adverse employment action in the context of a retaliation claim is different than the standard for a discrimination claim. As neither party acknowledged this difference, and the defendant actually argued that the standard is the same (see Def. Br. at 17), the parties should take note of this difference in the future.

employee or job applicant.  In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  126 S. Ct. 2405, 2409 (2006); see also Bush v. Regis Corp., 2007 WL 4230693, No. 07-12690 at *2 (11th Cir. Dec. 3, 2007); Taylor v. Roche. 196 Fed. Appx. 799, 802 (11th Cir. Sept. 12, 2006).  That is, the anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces injury or harm.  See Rutledge v. Sun Trust Bank, 2008 WL 161796, No. 07-12419 at *2 (11th Cir. Jan. 18, 2008) (citing Burlington, 126 S. Ct. at 2414).  The inquiry is individualized because the significance of any given act of retaliation will often depend on the particular circumstances.  See Taylor, 196 Fed. Appx. at 802 (citing Burlington, 126 S. Ct. at 2415).  But the acts must nevertheless be material and significant and not trivial.  See Rutledge, 2008 WL 161796 at *2 (citing Burlington, 126 S. Ct. at 2415).  The retaliation clause does not immunize an employee from those petty slights or minor annoyances that often take place at work and that all employees experience.  See Burlington, 126 S. Ct. at 2415.

Just as with her discrimination claim, Riccio clearly suffered an adverse employment action in June 2005 when her supervisory duties were removed.  See Section IV.A.2.a.  Although her pay did not change, this was a material and

44

significant change in her job duties, and easily satisfies the standard articulated by the Supreme Court in <u>Burlington</u>.  Defendant's arguments that she was later promoted and given a raise, and that she was not dissuaded from filing a charge of discrimination does not negate the adversity of the employment action, and are not well-taken.

c.  Causal Connection

"[T]o establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'"  <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993); <u>see also Brungart v. BellSouth Telecomms., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000).  Although "close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated," <u>Gupta</u>, 212 F.3d at 590, at a minimum, a plaintiff must generally establish that the decisionmaker was <u>actually aware</u> of the protected expression at the time it took adverse employment action.  <u>See Goldsmith</u>, 996 F.2d at 1163 (citing <u>Weaver v. Casa Gallardo, Inc.</u>, 922 F.2d 1515, 1525 (11th Cir. 1991); <u>Simmons v. Camden County Bd. of Educ.</u>, 757 F.2d 1187, 1189 (11th Cir.), <u>cert. denied</u>, 474 U.S. 981 (1985)).  The awareness of the protected statement, however, may be established by circumstantial evidence.  <u>Goldsmith</u>, 996 F.2d at 1163

45

(citation omitted).

The Board argues that Riccio failed to present sufficient evidence for a jury to conclude that Riccio established the requisite causal connection between her protected conduct  and the stripping of her supervisory duties.  Specifically, the Board argues that Pruitt was the decisionmaker responsible for the adverse employment action, and Riccio failed to present evidence that he was aware of Riccio's protected conduct at the time he removed her supervisory duties.  (Def. Br. at 19.)

Riccio offers two arguments in response to the Board's contention.  First, she asserts that Pruitt and Odom were aware that Riccio's complaint was one of sex discrimination, and that awareness, combined with the temporal proximity of the protected conduct to the adverse employment action, are sufficient to establish causation.  (Pl. Opp. Br. at 20.)  She contends that she established their awareness through direct, or at the very least, through circumstantial evidence.  (Id.)  Second, Riccio argues that Connie Pruett was also a decisionmaker, and Connie Pruett's undisputed awareness of the protected activity combined with the temporal proximity, are sufficient to establish causation.  (Id.)  If Riccio can establish either argument, then she created a jury issue on the causal link requirement of her

46

retaliation claim.[28]  See Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354

(11th Cir. 1999) (citing Goldsmith, 996 F.2d at 1163-64).  For the reasons below,

however, the court concludes that there is insufficient evidence to support Riccio's

arguments.

    With regard to her first theory, Riccio contends that there is both direct and

circumstantial evidence that Pruitt and Odom were aware of her protected activity.

The court disagrees.  There is no direct evidence of such knowledge.  As explained

in section IV.B.2.a., supra, the memorandum sent to Odom and given to Pruitt

does not amount to protected activity.  In addition, both Pruitt and Odom

unequivocally denied being aware that her complaint was one of gender

discrimination.  (Pruitt Dep. at 24; Odom Aff. ¶¶ 20-22.)

    Riccio offers the following circumstantial evidence to establish that Pruitt

and Odom were aware of her protected conduct:

    (i)  Pruitt and Connie Pruett "worked closely in responding to Ms. Riccio's
    concerns"; and
    (ii) Pruitt, Odom, and Connie Pruett were all present in the meeting where

---

[28] The court rejects the Board's argument that the temporal proximity between her
protected activity and her adverse employment action is not sufficiently close.  (Def. Br. at 19-
20.)  Riccio complained to Connie Pruett on May 16, 2005 that she believed that she was
not being paid as much as others doing the same job because she was a woman.  Riccio's supervisory
duties were removed on June 16, 2005, one month after her complaint.  The one-month time
period is sufficiently close to establish the requisite temporal proximity.  See Donnellon v.
Fruehauf Corp., 794 F.2d 598, 600-01 (11th Cir.1986) (one month between filing EEOC charge
and termination sufficient to establish temporal proximity).

the supervisory duties were taken away from Riccio.

(Pl. Opp. Br. at 20.)  Riccio argues that it is "hard to believe" that Pruitt and Odom were not aware of the "real" reason for her complaint, and that a jury could infer that Pruitt and Odom knew of her protected conduct from the above evidence. The law in the Eleventh Circuit does not support Riccio's argument.  For instance, in Goldsmith v. City of Atmore, Goldsmith, a black employee of the city, attempted to establish that she has been transferred by the mayor in retaliation for engaging in protected conduct under Title VII.  996 F.2d at 1157.  Goldsmith applied for a position as city clerk, but after learning the position would be filled by a white female, Goldsmith informed one of the city council members that she was going to file an EEOC complaint.  Id.  The next morning the council member met with the city's mayor.  Id.  After the meeting, the mayor met with Goldsmith and told her the clerk position she sought was filled and "there was nothing [Goldsmith] could do about it."  Id.  Three weeks later the mayor told Goldsmith to clean out her desk, because she had been transferred to the city library.  Id.

A key issue in that case was whether Goldsmith presented sufficient evidence to establish that the mayor was aware of her protected activity.  At trial, the mayor denied talking about Goldsmith during his meeting with the councilman but was impeached by his deposition testimony stating that he "may" have

48

discussed Goldsmith's complaints during their meeting.  Id. at 1163 & n.12.  The Eleventh Circuit held that those facts were sufficient for a jury to find that the mayor was aware of the employee's protected activity for purposes of satisfying the causal link requirement of Goldsmith's retaliation claim.  See id.

Unlike the plaintiff in Goldsmith, the evidence presented by Riccio is insufficient for a reasonable jury to find that Pruitt and/or Odom were of Riccio's protected activity when they removed her supervisory duties.  The evidence that Pruitt, Odom and Connie Pruett spoke in the time period between Riccio's protected activity and the decision to remove her supervisory duties her shows, at most, that Connie Pruett could conceivably have told Pruitt and/or Odom that Riccio told her she believed she was being paid less because she was a woman.  "'Could have told' is not the same as 'did tell.'"  Clover, 176 F.3d at 1355.  It would be sheer speculation to infer that Connie Pruett actually told Pruitt and/or Odom about Riccio's protected activity, especially in light of Pruitt and Odom's adamant denials that they were unaware that Riccio complained that her pay was lower because she was a woman.  Instead, the reasonable inference is that they discussed Riccio's memorandum, which did not mention gender discrimination, and that Odom and Pruitt explained why she was being paid less – because she was not technically a supervisor.  Mere speculation is not enough to support a jury

finding that Pruitt and/or Odom were aware of Riccio's protected conduct.  See id.

Goldsmith supports this conclusion.  Plaintiff Goldsmith had evidence to impeach the mayor's denial that he had discussed her protected conduct with the councilman. In stark contrast, Riccio offered no evidence to impeach the unequivocal denials by Pruitt and Odom that they had any knowledge that Riccio complained that she was being discriminated against in pay because she was a woman or that the subject was discussed with or by Connie Pruett.  Nor is there any testimony of Connie Pruett in the record to confirm or refute the denials made by Pruitt and Odom.   Accordingly, Riccio failed to present sufficient circumstantial evidence to establish that Pruitt and/or Odom were aware of Riccio's protected conduct.

Riccio's second theory of causation is that Connie Pruett actually participated in the decision to remove Riccio's supervisory duties.  In her brief, Riccio states that Pruitt, Odom and Connie Pruett "decided **together** that stripping Ms. Riccio of her supervisory duties was the right response to Ms. Riccio's complaints of pay inequity."  (Pl. Opp. Br. at 20) (emphasis in original).  This statement is not supported by the record.  The deposition testimony of Pruitt, cited by the plaintiff in support of this statement, does not establish that Connie Pruett participated in the decision, but instead Pruitt merely uses the word "we" when

50

talking about the decision. The use of the word "we" is too ambiguous for the court to make the inference made by plaintiff. Instead, reading the entire deposition and the other evidence in the record together, the word "we" most likely included only Pruitt and Odom, as there is no other indication whatsoever that Connie Pruett participated in any way in the decision to remove Riccio's supervisory duties. There is <u>no testimony at all</u> from Connie Pruett in the record, and there is no clear statement as to who was the ultimate decisionmaker. Moreover, there is no evidence that Connie Pruett, a human resources representative, even had authority to make such a decision. Instead, all of the evidence suggests that Pruitt made the decision, with possible input from Odom. (<u>See</u> Odom Aff. ¶ 21; Pruitt Aff. ¶ 4.) The court is unwilling to assume that Connie Pruett's mere presence in the meeting, along with the use of the word "we" in Pruitt's deposition testimony, establishes that Connie Pruett was involved in the decision to remove the supervisory duties from Riccio. Accordingly, Riccio failed to present sufficient evidence for a reasonable jury to conclude that Connie Pruett was a decisionmaker in the removal of Riccio's supervisory duties.

Because Riccio failed to present sufficient evidence either that (1) Pruitt and/or Odom were aware of her protected conduct or (2) Connie Pruett was a decisionmaker, the court concludes that Riccio did not present sufficient evidence

51

to permit a jury to reasonably find the requisite causal connection between her protected activity and the removal of her supervisory duties.  As it is Riccio's burden to establish that causal connection, the Board is entitled to summary judgment on Riccio's retaliation claim.

## V.  Conclusion

In summary, the motion for summary judgment (doc. # 14) is due to be granted in part and denied in part.  The court finds that no material issues of fact remain and that defendant the Board of Trustees of the University of Alabama is entitled to judgment as a matter of law as to the following discrimination claims: (1) denial of promotion in May 2004 to Construction Engineer I; (2) not being invited to the spring 2004 Facilities and Maintenance retreat; (3) the October 2004 pay raise of 3% as compared to the other engineer trainee's pay raise of 10%; (4) disparities in pay and office amenities as compared to maintenance supervisors in the fall of 2004; (5) not being invited to the Facilities Christmas party in December 2004; (6) office assignment in February 2005; and (6) removal of her supervisory duties in June 2005.  In addition, summary judgment is due to be granted as to Riccio's retaliation claim.

Summary judgment is due to be denied as to Riccio's claim of discrimination in her pay.

A separate order will be entered.

**DONE** this the ___22nd___ day of May, 2008.

_____

SENIOR UNITED STATES DISTRICT JUDGE